IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

LERMON RUSSELL

                Plaintiff,

v.                                      CIVIL ACTION NO.  2:19-cv-00918

COMMISSIONER LOLITA BUTCHER, et al.,

                Defendants.

MEMORANDUM OPINION AND ORDER

Pending before the court is a Motion to Dismiss, [ECF No. 9], and a Renewed Motion to Dismiss, [ECF No. 48], filed by Defendants Donald Ames, David Ballard, Lolita Butcher, Betsy Jividen, and the West Virginia Division of Corrections and Rehabilitation ("WVDOCR") (collectively "Defendants"). The Motions, [ECF Nos. 9, 48], are **GRANTED in part and DENIED in part** for the reasons that follow.

## I.    Introduction

This case involves a series of alleged assaults and other serious abuses—some allegedly motivated by race—that Plaintiff claims took place during his incarceration.

### (a) The parties

Plaintiff is in the custody of WVDOCR. Pl.'s Amend. Compl. [ECF No. 44] ¶ 1. At all times relevant to this action, Plaintiff was housed in administrative segregation on the Quilliams II unit within Mount Olive Correctional Complex ("MOCC").

At the time of the alleged attack by Inmate Jacob Samples upon Plaintiff, Defendant Lolita Butcher was the Commissioner of the WVDOCR and Defendant David Ballard was the Warden/ Superintendent of MOCC. *Id.* at ¶¶ 2, 4. At the time of the alleged assault of the Plaintiff by Defendants Bell and Benson, Defendant Betsy Jividen was the Commissioner of WVDOCR and Defendant Donald Ames was the Warden/Superintendent of MOCC. *Id.* at ¶¶ 3, 5. At all relevant times alleged in the Amended Complaint, Defendants Dylan Hayhurst, Matthew Hypes, Benjamin Elmore, Jesse Smith, Richard Toney, Dustin Bell, and Dakota Benton (collectively "Defendant Correctional Officers") were MOCC correctional officers posted or called to Quilliams II segregation unit. *Id.* at ¶ 6. Defendants Nurse Joyce Coleman and Nurse Joshua Gregory are, and at all relevant times alleged in the Amended Complaint were, registered nurses employed by Wexford Health Sources, Inc., and contracted by WVDOCR to provide medical services at MOCC. *Id.* at ¶ 6.

### (b) Procedural background

On December 31, 2019, Plaintiff filed his Complaint. [ECF No. 1]. On March 27, 2020, Defendants Ames, Ballard, Butcher, Jividen, and WVDOCR, filed a Motion to Dismiss. [ECF No. 9]. On March 31, 2020, Defendants Bell, Benton, Hayhurst, and Toney, filed a Motion to Dismiss or in the Alternative a Motion for Summary Judgment. [ECF No. 11]. On June 4, 2020, Plaintiff filed an Amended Complaint. [ECF No. 44]. The Amended Complaint voluntarily dismissed claims against Defendant the WVDOCR, identified Defendant "John Doe 1" as Correctional Officer Matthew Hypes, and dropped all requests for injunctive relief. *See* [ECF Nos. 1, 44].

On June 5, Defendants Hayhurst, Toney, Bell, and Benton renewed their Motion to Dismiss and in the Alternative Motion for Summary Judgment, incorporating their prior memorandum in support. [ECF No. 46]. On June 14, 2020, Defendants Ames, Ballard, Butcher, and Jividen renewed their Motion to Dismiss. [ECF No. 48]. On June 15, 2020, Defendant Smith joined in Defendant Correctional Officers' Motion to Dismiss. [ECF Nos. 11, 49].

### (c) Factual allegations

Plaintiff is a Black man, who according to him, was the only African American housed in his Pod (Pod 4) at MOCC. *Id.* at ¶ 13. According to Plaintiff, he was frequently subjected to the use of racial slurs and racist remarks by both fellow inmates and correctional officers. *Id.* at ¶ 12. The Amended Complaint states that Plaintiff's Pod was also populated with members of the Aryan Brotherhood, which "is the nation's oldest major white supremacist prison gang and a national crime syndicate." *Id.* at ¶ 15. The Amended Complaint specifically identifies four alleged Aryan Brotherhood members housed in Pod 4: Inmates Steven Branscome, Gregory Burdette, James Zell, and Jacob Samples. *Id.* at ¶ 16. Plaintiff's Amended Complaint claims that these inmates frequently used racial epithets towards him and threatened physical violence against him. *Id.* at ¶¶ 17–23. Plaintiff further claims that Inmate Samples had previously been allowed to enter the cell of a fellow inmate, Mike Connor, and attack him. *Id.* ¶ 24.

The Amended Complaint alleges the following incident. Defendant Correctional Officers Hayhurst and Hypes escorted Plaintiff to shower. *Id.* at ¶ 29.

Upon arrival to the shower area, Inmate Samples burst out of a hiding area and attacked Plaintiff, "while Defendants Hayhurst and Hypes stepped several feet away" leaving Inmate Samples "an unobstructed path towards" Plaintiff. *Id.* at ¶¶ 31–32. Plaintiff claims that Inmate Samples repeatedly stabbed him with a sharp foreign object, jammed his thumb into Plaintiff's eye and attempted to gouge out Plaintiff's eyeball, and repeatedly struck Plaintiff in the face and head. *Id.* at ¶¶ 33, 35, 36. At this time, Plaintiff had his hands cuffed behind his back and leg irons restraining his ankles, while Inmate Samples was unrestrained. *Id.* at ¶¶ 28, 32, 33. During the assault both Inmate Samples and Defendants Hayhurst and Hypes yelled racial slurs at Plaintiff, including the use of the n-word. *Id.* at ¶¶ 33, 34. Specifically, Plaintiff recalls the correctional officers screaming "kill that monkey." *Id.* at ¶ 34. During this attack, Plaintiff claims that neither Defendant Hayhurst nor Defendant Hypes intervened to stop the assault. *Id.* at ¶ 37. The Amended Complaint alleges that only once Inmate Samples "tired and removed himself voluntarily from atop" Plaintiff did Defendants Hayhurst and Hypes begin to deploy Oleoresin Capsicum ("OC") gas spray towards the both Inmate Samples and Plaintiff. *Id.* at ¶¶ 39–41. At that point, Plaintiff claims he lost consciousness only to be "roused awake by a jarring kick to the side of his body by Defendant Hayhurst." *Id.* at ¶ 44.

The Amended Complaint alleges Defendants Hayhurst and Hypes then took Plaintiff to be medically evaluated by Defendant Nurse Coleman. *Id.* at ¶ 45. Plaintiff claims that Defendant Toney was present for the medical evaluation. *Id.* Plaintiff states that he was not provided with any substantive medical care and instead was

merely told that "he was in shock" and "that he would be fine." *Id.* at ¶¶ 47–48. "Plaintiff expressed to Defendant Toney his grievance and reasonable belief that his attack had been arranged for and ordered by the Aryan Brotherhood." *Id.* at ¶ 49. According to Plaintiff, "Defendant Toney dismissed Plaintiff's grievance, and responded by saying 'this conversation is over and this incident never happened.'" *Id.* at ¶ 50. Plaintiff was allegedly "not allowed until over an hour later to take a shower and rinse off the OC gas that was burning his body." *Id.* at ¶ 52.

In the weeks that followed the incident, Plaintiff claims he made continued requests for additional medical treatment and expressed that he feared for his safety in Pod 4. *Id.* at 53–57. Plaintiff alleges that he never received additional medical treatment. *Id.* at 53–56. The Amended Complaint also claims that his grievances were ignored until "approximately five months after he was attacked by Inmate Samples, Plaintiff was transferred out of Pod 4 only after Inmate Branscome specifically threatened to stab the Plaintiff." *Id.* at ¶ 57.

According to Plaintiff, Inmate Samples informed Plaintiff that Defendants Hayhurst, Hypes, Elmore, Smith, and Toney knew of the Aryan Brotherhood's plan to attack Plaintiff. *Id.* at ¶ 64. The Amended Complaint contains allegations that Defendants Smith and Elmore used racial slurs, including the n-word, against Plaintiff and that they tried to incite tension between Plaintiff and the Aryan Brotherhood members. *Id.* at ¶¶ 58–62.

Plaintiff's Amended Complaint alleges a second series of incidents which took place in March of 2019. The incidents are alleged as follows. Defendant Correctional

Officers Benton and Bell repeatedly threw Plaintiff's breakfast on the floor while repeatedly yelling racial slurs, including the n-word, at him. *Id.* ¶¶ 69–76. At one point, Defendant Benton allegedly threw a pitcher of hot coffee on Plaintiff through the bean hole in his cell, causing burns to Plaintiff's stomach and groin areas. *Id.* at ¶ 72. At another point, Defendant Benton "flipped the [food] tray in the air to make it appear that the Plaintiff had thrown his tray at Defendants Benton and Bell. Defendant Benton then rushed into Plaintiff's cell and began spraying him with a chemical agent known as phantom gas until the large cannister was empty, causing severe burning" to Plaintiff's body. *Id.* at ¶¶ 75, 76. Defendants Benton and Bell then allegedly shackled Plaintiff hands and feet and removed him from his cell. The Amended Complaint claims that "Defendants Benton and Bell [then] began falsely and loudly proclaiming that the Plaintiff was resisting, and these officers then threw the Plaintiff to the floor head-first and began punching and kicking him while he was fully restrained." *Id.* at ¶¶ 77, 78. Plaintiff claims that after this assault he was taken to Defendant Nurse Joshua Gregory, who allegedly failed to provide any substantive treatment of his injuries. *Id.* at ¶ 82.

The Amended Complaint also includes several allegations regarding a photo that was released in December 2019 "depicting more than thirty (30) correctional officers employed by the WVDOCR giving a Nazi salute." *Id.* at ¶ 87–91.

In the Amended Complaint, Plaintiff alleges the following claims[1]: Eighth Amendment violations and violations of "the Constitutions, statutes and common law

---

[1] The Amended Complaint is not clear as to the causes of action alleged in Counts I, II, IV, VII, VIII. Furthermore, it is not clear which Defendants Plaintiff brings Counts

of the State of West Virginia and the United States of America" (Count I); "violations of clearly established rights secured to Plaintiff under the Constitutions, statutes and common law of the State of West Virginia and the United States of America" (Count II) against Defendants Hayhurst and Hypes; Eighth Amendment violations for use of excessive force (Count III) against Defendants Bell and Benson; Eighth Amendment violations and/or negligence for failure to provide medical care (Count IV); civil conspiracy (Count V) against Defendants Hayhurst, Hypes, Elmore, Smith, and Toney; Equal Protection Clause of the Fourteenth Amendment violations (Count VI) against all Defendants; supervisory liability (Count VII)[2] against Defendants Butcher, Jividen, Ballard and Ames; and supervisory liability (Count VIII) against Defendants Butcher, Jividen, Ballard, and Ames. [ECF No. 44].

Defendants now move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) all claims made against them.

## II.   Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "When ruling on a motion to dismiss, courts must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in

---

I, IV, VI against. I construe, as do Defendants, the Amended Complaint to allege only Counts VII and VIII against Defendants Butcher, Jividen, Ballard and Ames. These Counts are the only Counts that specifically name these Defendants and the only Counts to include any factual assertions about their involvement.

[2] Plaintiff's Amended Complaint refers to a "Joseph Braddock"; however, I assume, as do Defendants, that the Amended Complaint meant to refer to Plaintiff Lermon Russell.

favor of the plaintiff." *Farnsworth v. Loved Ones in Home Care, LLC*, No. 2:18-CV-01334, 2019 WL 956806, at *1 (S.D.W. Va. Feb. 27, 2019) (citing *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

To survive a motion to dismiss, the plaintiff's factual allegations, taken as true, must "state a claim to relief that is plausible on its face." *Robertson v. Sea Pines Real Estate Co.*, 679 F.3d 278, 288 (4th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The plausibility standard is not a probability requirement, but "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Although "the complaint must contain sufficient facts to state a claim that is plausible on its face, it nevertheless need only give the defendant fair notice of what the claim is and the grounds on which it rests." *Hall v. DIRECTV, LLC*, 846 F.3d 757, 777 (4th Cir. 2017). Thus, "a complaint is to be construed liberally so as to do substantial justice." *Id.*

Courts are limited to the pleadings in evaluating a motion to dismiss. But when a Defendant submits evidentiary documents at the motion to dismiss stage, the motion may be converted to a motion for summary judgment. *See* Fed. R. Civ. P. 12(d). Rule 12(d) dictates that when a motion to dismiss is converted into a motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.*

In this case, Defendants provide on a series of grievances submitted by Plaintiff to the prison, which they attach as Exhibit B–J to their Motion. [ECF No. 11]. These grievances, however, constitute evidence outside the pleadings and thus

in order for me to consider them, the instant Motion would have to be converted to a motion for summary judgment. Plaintiff argues that he has not had adequate discovery at this stage to present all material that pertains to the issue of administrative exhaustion. I agree. Plaintiff represents to the court, both in the Amended Complaint and his response to the instant Motion, that there are additional grievances, which may be relevant to his claims that have not been submitted by Defendants. *See* Amend. Compl. [ECF No. 44] ¶ 54 ("Plaintiff submitted grievances regarding Inmate Samples' attack, and in part, requested that he be transferred from Pod 4 because he feared for his safety and that he would be attacked yet again by members of the Aryan Brotherhood."); *See* Amend. Compl. [ECF No. 44] ¶ 84 ("Plaintiff filed a grievance regarding Officers Benton and Bell's assault, which on information and belief, led to an investigation."); *see also* Pl.'s Resp. [ECF No. 17] 10–11. Out of an abundance of caution, I find that it would be premature to decide Defendants' Motion as a motion for summary judgment at this stage in the litigation. I treat the Motion as a motion to dismiss and do not consider the Exhibits provided by Defendants.

### III.   Discussion

### (a) Sovereign Immunity

In their Motion, [ECF No. 9], Defendants argue that Defendant WVDORC is entitled to sovereign immunity under the Eleventh Amendment. Plaintiff's Amended Complaint voluntarily dismissed all claims against WVDOCR. [ECF Nos. 22, 44].

Accordingly, Defendants' Motion to Dismiss and Renewed Motion to Dismiss, [ECF Nos. 9, 48], are **DENIED as MOOT** as to the WVDOCR.

### (b) Injunctive relief

Defendants move to dismiss Plaintiff's claims for injunctive relief as speculative and on the bases that he lacks standing. Plaintiff's Amended Complaint removed his prior requests for injunctive relief. Accordingly, Defendants' Motion to Dismiss and Renewed Motion to Dismiss, [ECF Nos. 9, 48], Plaintiff's requests for injunctive relief are **DENIED as MOOT**.

### (c) Capacity to be sued under 42 U.S.C. § 1983

Defendants next argue that they are not "persons" under the meaning of 42 U.S.C. § 1983 and therefore do not have the capacity to be sued for money damages. Defendants are correct that in order to state a claim for damages under 42 U.S.C. § 1983, an aggrieved party must sufficiently allege that she was injured by "the deprivation of any [of her] rights, privileges, or immunities secured by the [United States] Constitution and laws" by a "person" acting "under color of state law." *See* 42 U.S.C. § 1983; *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978). Defendants would undoubtedly be correct if the Amended Complaint had sued Defendants *exclusively* in their official capacities. *See Hafer v. Melo*, 502 U.S. 21, 26 (1991). The Amended Complaint, however, clearly sues Defendants Butcher, Jividen, Ballard, and Ames in their individual capacities. Pl.'s Amend. Compl. [ECF No. 44] ¶¶ 2–4. Dismissal on this basis is therefore improper.

### (d) Exhaustion

Defendants argue Plaintiff's Amended Complaint should be dismissed because he did not exhaust his administrative remedies as required under the Prison Litigation Reform Act ("PLRA") and the West Virginia Prison Litigation Reform Act ("WVPLRA"). Administrative exhaustion is a threshold question that must be decided before determining the merits of a case. *Id.* Whether an administrative remedy has been exhausted for purposes of the PLRA "is a question of law to be determined by the judge." *Creel v. Hudson*, No. 2:14-cv-10648, 2017 WL 4004579, at *3 (S.D. W. Va. 2017) (citing *Drippe v. Tobelinski*, 604 F.3d 778, 782 (3d Cir. 2010)). "Failure to exhaust available administrative remedies is an affirmative defense, not a jurisdictional requirement, and thus inmates need not plead exhaustion, nor do they bear the burden of proving it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). Failure to exhaust may be a basis for a dismissal for a failure to state a claim. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *see also Legg v. Adkins*, No. 2:16-CV-01371, 2017 WL 722604, at *2 (S.D.W. Va. Feb. 23, 2017) (granting a motion to dismiss a prisoner's claims for failure to exhaust under the PLRA and WVPLRA). But "only in rare cases will a district court be able to conclude from the face of the complaint that a prisoner has not exhausted his administrative remedies and that he is without a valid excuse." *See Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (quoting *Freeman v. Watkins*, 479 F.3d 1257, 1260 (10th Cir.2007)).

Both PLRA and WVPLRA require inmates to exhaust their administrative remedies before they bring a lawsuit. 42 U.S.C. § 1997e(a); W. Va. Code § 25-1A-2a(i). Under the PLRA, "[n]o action shall be brought with respect to prison conditions under

section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has interpreted the PLRA broadly, stating that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Similarly, the WVPLRA makes it mandatory for an inmate to first exhaust administrative remedies provided by the inmate's correctional facility before instituting a civil action challenging the inmate's confinement. W. Va. Code § 25-1A-2; *see also White v. Haines*, 618 S.E.2d 423, 431 (W. Va. 2005) ("[B]efore an inmate may bring a civil action challenging the conditions of his/her confinement, he/she must first exhaust the administrative remedies provided by the correctional facility in which he/she is housed."). The WVPLRA provides that: "[a]n inmate may not bring a civil action regarding an ordinary administrative remedy until the procedures promulgated by the agency have been exhausted." W. Va. Code § 25-1A-2(c). An "ordinary administrative remedy" is "a formal administrative process by which an inmate submits a grievance seeking redress or presenting concerns regarding any general or particular aspect of prison." *Id.* § 25-1A-2(a).

The WVDOCR sets the uniform procedures for filing an inmate grievance. *See* W. Va. Code § 25-1A-2. If an inmate fails to fully comply with the provisions of those rules, the inmate "shall not be considered to have taken full advantage of

administrative remedies afforded him/her and therefore has not exhausted administrative remedies." *Miller v. Rubenstein*, No. 2:16-CV-05637, 2018 WL 736044, at *5 (S.D.W. Va. Feb. 6, 2018) (citing Policy Directive 335.00(V)(D)(4)).

The procedure for filing an inmate grievance is as follows:

> An inmate may file a grievance using forms provided by the prison "within fifteen (15) days of any occurrence that would cause him/her to file a grievance." Only one issue or complaint may be grieved per form, and the inmate must submit the form to his or her unit manager. Upon receipt of the grievance form, the unit manager logs the grievance and assigns it a number. The unit manager is required to return an answer to the grievance back to the inmate within five days. If the unit manager fails to answer or reject the grievance within five days, the inmate may treat the non-response as a denial and proceed to the next level of review. Appeals from the unit manager's response (or non-response, as the case may be) are submitted "to the Warden/Administrator within five (5) days from delivery of the response." "The Warden/Administrator shall respond to the appeal ... within five (5) days." Finally, if the warden's response is unsatisfactory, or if the warden does not respond within the applicable time, the inmate may appeal to the Commissioner of the Division of Corrections within five days of the warden's response or after the applicable time has passed. The Commissioner is allotted ten days to respond to the appeal.

*Id.* (quoting Policy Directive 335.00) [3]

Policy Directive 335.00 specifically states that, "'[e]xhaustion' shall mean submitting an accepted grievance and properly appealing an accepted grievance fully and receiving a final response thereto by the Commissioner. Rejections do not constitute exhaustion. Remands are not final responses unless expressly stated in the

---

[3] Defendants in this case point to Section 90 of the West Virginia Code Regulations as the authority which outlines the grievance procedure process. Section 90, however, was repealed in 2016.

decision." *Hatcher v. Rubenstein*, No. 2:17-CV-02054, 2018 WL 6036433, at *9 (S.D.W. Va. Aug. 8, 2018), report and recommendation adopted, No. 2:17-CV-02054, 2018 WL 4628321 (S.D.W. Va. Sept. 27, 2018) (quoting Policy Directive 335.00(V)(D)(4)). The Policy Directive further provides that "[a]ny inmate who fails to fully and properly comply with the provisions set forth in this Policy Directive shall not be considered to have taken full advantage of administrative remedies afforded him/her and therefor has not exhausted administrative remedies." *Id.* (quoting Policy Directive 335.00(V)(A)(5)).

To the extent that Plaintiff in this case argues WVPLRA does not require an inmate to exhaust administrative remedies for allegations of "violence, sexual assault or sexual abuse against an inmate," Plaintiff is incorrect. In 2013, the WVPLRA statute was amended to say "no inmate shall be prevented from...bringing a civil or criminal action alleging violence, sexual assault[,] or sexual abuse, *after exhaustion of administrative remedies.*" W. Va. Code § 25-1A-2a(i) (emphasis added). Exhaustion is still required for the types of claims made by Plaintiff. *See e.g.*, *Miller v. Rubenstein*, No. 2:16-CV-05637, 2018 WL 736044, at *6–7 (S.D.W. Va. Feb. 6, 2018); *Baker v. Hammons*, No. 2:15-CV-13849, 2016 WL 538481, at *2 (S.D.W. Va. Feb. 9, 2016).

In this case, Defendants argue Plaintiff failed to exhaust administrative remedies under the PLRA and WVPLRA. As previously stated, Defendants rely on grievances attached as exhibits as integral to their argument. [ECF No. 11]. These exhibits reflect that the grievances submitted by Plaintiff were rejected for not

following proper procedure, either because they were untimely and/or because the single envelope included multiple grievances. *See* Exhibit B–J [ECF No. 11–2–10]. As Defendants correctly indicate, a rejected grievance does not exhaust available administrative remedies. It is clear to the court, at this point in the litigation, that if these grievances were the only grievances submitted by Plaintiff then Plaintiff failed to satisfy exhaustion under the PLRA and WVPLRA. However, because Plaintiff claims that other grievances exist and that further discovery is needed to recover them, it would be premature to consider Defendants' Motion as a motion for summary judgment. At the motion to dismiss stage, it is improper to consider evidence external to the pleadings. I do not consider the exhibits provided by Defendants at this time.

Absent this evidence, I find that Defendants have not sufficiently demonstrated their affirmative defense that Plaintiff failed to exhaust administrative remedies. Accordingly, dismissal on this basis is not warranted at this time.

### (e) Qualified immunity

Defendants next argue that they are entitled to qualified immunity. I am frustrated with the notable lack of clarity in the Plaintiff's Amended Complaint as to the causes of action brought therein. In both Count VII and Count VIII, Plaintiff asserts that Defendants violated the "Constitutions, statutes and common law of the State of West Virginia and the United States of America" without specifying which statutes and laws. *See* Amend. Compl. [ECF No. 44] ¶¶ 153, 159.

The Amended Complaint alleges two claims, Count VII and Count VIII, against Defendants. These Counts appear functionally indistinguishable from one

another. Count VII claims that "Defendants Butcher, Jividen, Ballard and Ames owed a duty of care to the Plaintiff pursuant to the Constitutions, statutes and common laws of the State of West Virginia and the United States of America to prevent the constitutional deprivations he suffered related to the attack by Inmate Samples and his assault by Defendants Bell and Benson." Amend. Compl. [ECF No. 44] ¶ 150. Count VII alleges that Defendants breached that "duty of care" by the following:

> (1) failing to provide sufficient and adequately trained staff at Quilliams II on the day the Plaintiff was attacked by Inmate Samples; (2) failing to properly screen and segregate the Plaintiff from Inmate Samples, despite knowledge of the specific threat Inmate Samples posed to the Plaintiff and Inmate Samples' significant history of violence; (3) failing to establish policies related to the use of excessive force by correctional officers; (4) failing to provide and establish reasonable and acceptable safety procedures; (5) failing to provide and establish necessary and appropriate security measures; (6) failing to develop and implement a reasonable and acceptable classification system and corresponding housing plan at MOCC; (7) failing to adopt reasonable and acceptable policies and procedures related to the intervention of MOCC staff to prevent the attack of the Plaintiff perpetrated by Inmate Samples; (8) failing to adopt reasonable and acceptable policies and procedures related to providing adequate and timely medical care to the Plaintiff; and (9) by otherwise acting or failing to act in other manners that are in contravention to the Constitutions, statutes and common law of the State of West Virginia and the United States of America.

*Id.* at ¶ 151. Count VIII alleges that Defendants "Butcher, Jividen, Ballard and Ames owed the Plaintiff a duty to use due care in the supervision and training of correctional officers at MOCC." *Id.* at ¶ 156. Plaintiff alleges that "the

implementation and existence of customs, policies and acts of these Defendants" breached of this duty resulting in "deprivation of the constitutional and other legal rights of the Plaintiff." *Id.* at ¶ 157. In both Count VII and Count VIII, Plaintiff alleges the Defendants' actions constitute "negligence, recklessness, and deliberate indifference to the rights of the Plaintiff."

The Amended Complaint does not specifically refer to a single West Virginia state policy, procedure, rule, regulation, or statute, besides "negligence." Affording Plaintiff the most generous reading of the Amended Complaint, I interpret any alleged violations of the "Constitutions statutes and common law of the State of West Virginia" made against these Defendants in Counts VII and VIII to refer to the tort of negligence. In the opening of the Amended Complaint, Plaintiff states that he brings his claims pursuant to 42 U.S.C. § 1983 for violations of the Eighth and Fourteenth Amendments of the United State Constitution. I construe any alleged violations of the "Constitutions, statutes and common law of the United States" to refer to violations of the Eighth and Fourteenth Amendments made pursuant to § 1983.

### 1. State law claims

Defendants here are entitled to qualified immunity on state law claims for negligence. Under West Virginia law, "[a] public executive official who is acting within the scope of his authority … is entitled to qualified immunity from personal liability for official acts if the involved conduct did not violate clearly established laws of which a reasonable official would have known." *Parkulo v. W. Virginia Bd. of Prob.*

& *Parole*, 483 S.E.2d 507, 510 (W. Va. 1996). "The doctrine of qualified or official immunity bars a claim of mere negligence" against a state officer "acting within the scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer." *Clark v. Dunn*, 465 S.E.2d 374 (W. Va. 1995). Under West Virginia law, "broad categories of training, supervision, and employee retention, as characterized by respondent, easily fall within the category of 'discretionary' governmental functions." *W. Virginia Reg'l Jail & Corr. Facility Auth. v. A.B.*, 766 S.E.2d 751, 773 (W. Va. 2014) (finding that the state agency was entitled to qualified immunity on a simple negligence claim for failure to reasonably train, supervise, and screen employees, absent a showing that the agency violated a clearly established law). Barring a showing by Plaintiff that Defendants violated a "clearly established right or law" with respect to hiring, training, and developing procedures, Defendants are entitled to qualified immunity on claims involving these discretionary acts. *See id*.

To demonstrate a clearly established right was infringed upon, a plaintiff "must do more than allege that an abstract right has been violated. Instead, the plaintiff must make a 'particularized showing' that a 'reasonable official would understand that what he is doing violated that right' or that 'in the light of preexisting law the unlawfulness' of the action was 'apparent.'" *Id.* at 776 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Here, the Amended Complaint does not contain any allegations that Defendants were involved in Plaintiff's injuries beyond their role as supervisors—

18

developing policies and procedures at MOCC and training, supervising, and screening employees. These actions fall within the category of "discretionary" government functions. Plaintiff fails to identify a specific state law or regulation in his Amended Complaint that Defendants have violated. Defendants are entitled to qualified immunity in so far as Plaintiff asserts that their actions were merely negligent. Defendants' Motion to Dismiss, [ECF No. 9], and Renewed Motion to Dismiss, [ECF No. 48], are **GRANTED** as to claims made pursuant to "Constitutions, statutes and common law of the State of West Virginia" contained in Count VII and Count VIII.

### 2.  Federal law claims

Turning to alleged violations of the Eighth Amendment and Fourteenth Amendment brought pursuant to § 1983, I find that Defendants are entitled to qualified immunity. Under the doctrine of qualified immunity, "[g]overnmental officials performing discretionary functions are shielded from liability for money damages so long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Thus, the court must undertake a two-part inquiry: (1) viewing the facts in the light most favorable to the Plaintiff, the court must determine if there was a constitutional violation; and (2) if so, whether the right violated was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). If the answer to either question is no, then the Defendants are entitled to qualified

immunity. The Supreme Court previously required courts to address the first prong before the second. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). "In 2009, however, the Court held that judges 'should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018) (quoting *Pearson*, 555 U.S. at 236).

"Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "When determining whether a right was 'clearly established,' '[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established.'" *Mack v. Turner*, No. 5:15-03589, 2016 WL 7840216, at *6 (S.D. W. Va. Dec. 13, 2016) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)). "To be 'clearly established,' '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Though, of course "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. 730, 741 (2002).

The Supreme Court has "repeatedly told courts ... not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, (2011). Thus, courts consider whether a right is clearly established "in light of the

specific context of the case, not as a broad general proposition." *Adams*, 884 F.3d at 227 (citing *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015)).

The Fourth Circuit has firmly held that "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984). "Liability in this context is not premised on respondeat superior, *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978), but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Id.*; *see also Iqbal*, 556 U.S. at 677 ("[i]n the context of determining whether there is a violation of a clearly established right to overcome qualified immunity, purpose rather than knowledge is required..."). Plaintiffs in supervisory liability cases assume a heavy burden of proof. *Id.* There are three elements necessary to establish supervisory liability:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw*, 13 F.3d at 799.

In order to establish the first element, the plaintiff must show "(1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the

conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff." *Id.* "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id.*

The plaintiff can establish deliberate indifference in the second element "by demonstrating a supervisor's 'continued inaction in the face of documented widespread abuses.'" *Id.* (citations omitted). The plaintiff assumes a "heavy burden of proof" because the plaintiff "cannot satisfy his burden [] by pointing to a single incident or isolated incidents." *Id.*

The third element is established "when the plaintiff demonstrates an 'affirmative causal link' between the supervisor's inaction and the harm suffered by the plaintiff." *Id.* (citations omitted). Causation in this context encompasses both cause in fact and proximate cause. *Id.*

Here, Defendants are entitled to qualified immunity. First, at the outset, the Amended Complaint barely ties the Defendants alleged conduct to a specific constitutional violation. The Amended Complaint mentions "excessive force" and "deliberate indifference" in Counts VII and VIII. But that language is the only clue as to which provisions of the Constitution Defendants allegedly violated. Second, the allegations in Counts VII and VIII do not plausibly allege that these Defendants possessed the requisite intent to deprive Plaintiff of rights that are clearly established. The Amended Complaint provides a long list of alleged failures in

excessive force policies, medical care policies, safety procedures, security measures, inmate classification systems, and general training and supervision. These allegations, however, do not provide sufficient factual assertions about *how* or *why* these policies and procedures are inadequate. The Amended Complaint does not plausibly connect, to the extent necessary to demonstrate "tacit authorization," the conduct of these Defendants to the alleged excessive force used against Plaintiff by Defendants Bell and Benson and to the alleged attack by Inmate Samples. *See Slakan*, 737 F.2d at 372. Plaintiff does not plausibly allege that these Defendants had knowledge of widespread abuses. Simply alleging that they failed to investigate grievances is insufficient. *See Green v. Beck*, 539 F. App'x 78, 81 (4th Cir. 2013) (finding an alleged failure of supervisory officials to investigate grievances was not sufficient to establish liability under § 1983). Plaintiff's conclusory allegations on Counts VII and VIII are not sufficient to overcome these Defendants' qualified immunity defense. Accordingly, Defendants' Motion to Dismiss and Renewed Motion to Dismiss, [ECF No. 9, 48], are **GRANTED**.

## IV.    Conclusion

Defendants Motion to Dismiss, [ECF No. 9], and Renewed Motion to Dismiss, [ECF No. 48], are **GRANTED in part and denied in part**. The Motions are **DENIED as MOOT** as to the WVDOCR, who is no longer a party to this case. The Motions are **DENIED as MOOT** as to Plaintiff's request for injunctive relief. The Motions are **GRANTED** as to all remaining claims against Defendants Ames, Ballard, Butcher,

and Jividen. The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:      July 17, 2020

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE